**E-FILED**
Friday, 24 June, 2016  02:05:30 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| TRAVIS L. WAGNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15-cv-3101 |
| | ) | |
| CAROLYN COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Travis L. Wagner appeals from the denial of his application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  Wagner has filed a Motion for Summary Judgment (d/e 18), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 21).  The parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before this Court. Consent to the Exercise of Jurisdiction by a United States Magistrate and Reference Order entered November 4, 2015 (d/e 14).  For the reasons set forth below, the Decision of the Commissioner is reversed and remanded under 42 U.S.C. § 405(g) sentence four.

STATEMENT OF FACTS

Wagner was born on August 1, 1970.  R. 44.  He completed high school.  R. 49, 270.  He previously worked as a hand packager and a manager/night bartender at a restaurant.  R. 24, 244, 270.  On October 31, 2012, Wagner applied for Disability Benefits.  Wagner alleged that his disability began on February 4, 2012.  R. 42, 202-14, 451.  Wagner suffers from degenerative disc disease of the cervical spine with radiculopathy in the upper extremities, bilateral degenerative disease of the hips, right shoulder tendinopathy, history of lumbar spine surgery, gout, and obesity.  R. 14.

On December 8, 2009, Wagner filed a prior application for Disability Benefits.  At that time, Wagner alleged he was disabled since December 2, 2009, due to alcoholism, gout, cellulitis, back injury, immobility of the left leg, depression, mental anxiety, and burns on the right foot.  R. 244, 447; see generally R. 99-100, 134-35, 240-64, 418-47.  On February 11, 2010, Wagner completed a form entitled "Physical Impairments Questionnaire" for the Illinois Disability Determination Services.  Wagner stated that he could sit for two hours without having to get up to stand or walk.  R. 264.  On May 12, 2010, Wagner's December 8, 2009 application for Disability benefits was denied.  R. 99-100.

On February 10, 2012, Wagner saw Advanced Practice Nurse Diana Oakley at the Sarah Bush Lincoln Health Center in Mattoon, Illinois, with right shoulder pain.  Wagner reported that he hurt his shoulder on February 4, 2012 at work.  He was packing paper cups into boxes.  The paper cups were packaged in plastic sleeves.  Each sleeve of cups weighed two to two and one-half pounds.  Wagner reported feeling an "immediate sharp pain" when he grabbed four sleeves of cups to pack them into a box.  Wagner reported that the pain had persisted ever since.  Rest and ice did not help.  Ibuprofen helped, but caused an upset stomach.  Vicodin helped with the pain.[1]  Wagner reported pain in his entire right shoulder radiating into his right arm.  He also reported burning pain in his right fifth finger and numbness in all of his right fingers.  Wagner reported that he was in "agony" and could not sleep.  R. 451.

On examination, Oakley observed that Wagner could "fully flex and extend, abduct and adduct the digits of the right hand."  Wagner could fully flex and extend both wrists.  Wagner had difficulty flexing his right elbow and limited range of motion in his right shoulder.  Wagner had normal range of motion in his cervical spine.  R. 451-52.  Oakley ordered an x-ray of Wagner's right shoulder.  The x-ray showed moderate degenerative

---

[1] Wagner took "2 year old leftover Vicodin."   R. 451.  The source of the Vicodin is not otherwise identified.

changes of the acromioclavicular joint without bony abnormality.  R. 504, 522.  Oakley opined that lifting ten pounds of cups did not cause his symptoms.  Oakley continued the Vicodin and referred Wagner to his primary care physician for follow-up.  Oakley took Wagner off work until he was evaluated by his primary care physician.  R. 452.

On February 13, 2012, Wagner saw Physician's Assistant Gary Hayden at the offices of Dr. David Oligschlaeger, D.O., for right shoulder pain.  Wagner described the pain "as moderate in severity, constant, dull, throbbing, and burning."  Wagner also reported numbness in the right hand and fingers.  Wagner reported that NSAIDs relieved the pain.  At the time of the examination, Wagner was 5 feet, 11 ¾ inches tall and weighed 230 pounds.  On examination, Wagner had pain on palpitation of the superior trapezius and cervical right paraspinal muscles; limited range of motion in the right shoulder; and neurovascular sensory deficit in the C5 and T1 dermatomal distribution.  Hayden assessed shoulder pain and cervical radiculopathy.  R. 474-75.  Hayden ordered an x-ray of Wagner's cervical spine.  Hayden gave Wagner a note stating that Wagner "is off of work until further notice.  Under our care."  R. 553.

On February 17, 2012, Wagner underwent an x-ray of his cervical spine.  The x-ray showed abnormal appearance of the C5 vertebral body,

marked osteophytic impingement upon the left intervertebral foramen at C5-6 level, mild levoscoliosis of the upper cervical spine.  The radiologist recommended an MRI.  R. 501.

On March 5, 2012, Wagner underwent an MRI of the cervical spine. The MRI showed disk bulging and herniation impinging on the cord at the midline C5-6; spondylosis and small protruded herniation on the left C5-6 impinging on the thecal sac and the nerve root sleeve; mild posterior disk bulging at C2-3; and degenerative changes that were "mild in most locations and moderate to marked particularly at the C5-6."  On March 7, 2012, Hayden recommended a neurosurgical consult "with all the MRI changes and arm pain and weakness."  R. 500.

On April 4, 2012, Wagner received a note on stationary which had the letterhead for the offices of Dr. Oligschlaeger and Physician's Assistant Hayden.  The note stated, "To Whom It May Concern:  Travis has been seen in our offices for a workers comp injury on February 13, 2012.  He is unable to work at this time."  The note was not signed, but was stamped with the printed names and office address of Dr. Oligschlaeger and Hayden.  R. 459.

On June 7, 2012, Wagner saw Dr. Donald DeGrange, M.D., at the request of the worker's compensation insurance carrier of Wagner's former

employer.  Wagner reported constant pain in his right arm and his neck.
Wagner reported pain, numbness, and burning on the right side of his neck
and throughout his right shoulder, arm, hand, and fingers.  He reported that
movement made the pain worse, and nothing made the pain better.
R. 463.  Wagner reported that his neck pain was "frequently mild and
occasionally moderate to severe with activities."  Wagner reported that the
pain in his hand was "most intense in the thumb and index finger."  R. 465.

On examination, Dr. DeGrange found that Wagner had limited range
of motion in his cervical spine, mild weakness to flexion and extension in
the elbow and wrist, and mild decrease in sensation over the first dorsal
webspace of the right hand.  Dr. DeGrange reviewed the March 5, 2012
MRI and noted significant congenital spinal stenosis, mild degenerative
changes at C2-3, C3-4, and C4-5, and more significant degenerative
changes at C5-6 and C6-7.  Dr. DeGrange concluded that these findings
indicated "clinically significant spinal stenosis, as well as lateral recess and
foraminal compromise bilaterally."  R. 466.  Dr. DeGrange opined that
these changes made Wagner "susceptible to injury with the most minor
provocation."  R. 467.  Dr. DeGrange stated, "It is my opinion that the
incident in question has precipitated his current medical condition that an
otherwise normal spinal canal would not have caused this degree of

subjective complaints and functional disability." R. 466. Dr. DeGrange opined, however, that Wagner could perform light duty work in his current condition if such work were available. R. 467.

On August 2, 2012, Wagner saw neurosurgeon Dr. Oliver Dold, M.D. complaining of neck and right arm pain. Wagner reported severe pain radiating from his neck down his right shoulder and arm. He reported numbness and tingling in his right fingers. Wagner also reported some weakness. He reported that he could not lift a gallon of milk. Wagner rated his pain as 10 on a scale of 1 to 10.

On examination, Wagner's neck motion was restricted, and he had tenderness at the base of the neck and along the right trapezius muscle border. Manipulation of the right shoulder was painful. Dr. Dold found no wasting or weakness in the intrinsic hand muscles. Wagner had decreased pinprick sensation in the right arm. Wagner's gait was normal, and he had good range of motion in his lumbar spine. Dr. Dold assessed cervical radiculopathy and mechanical problems with the right shoulder. Dr. Dold recommended an MRI of the right shoulder and possibly EMG and nerve conduction studies. Wagner reported that he was taking hydrocodone-

acetaminophen and ibuprofen for pain.  Dr. Dold prescribed Norco for pain.
R. 481-82.[2]

On August 6, 2012, Wagner underwent an MRI of his right shoulder.
The MRI showed hypertrophic AC joint degenerative changes with
impingement.  The radiologist assessed rotator cuff tendinopathy without
evidence of a tear, and biceps tendon subluxation without dislocation.
R. 498.

On December 20, 2012, Wagner completed a Function Report-Adult.
R. 287-94.  Wagner reported that he lived in a house with his parents.
Wagner reported that he was in constant pain in his neck.  He reported
limited movement in his right arm and left leg.  He reported that he could
not lift more than ten pounds.  R. 287.  Wagner reported that he did not do
anything during a typical day because of the pain.  R. 288.  Wagner
reported that he watched television during the day.  R. 291.  He had
difficulty getting dressed, showering, combing his hair, and shaving.  He did
not cook, do housework, or yard work.  R. 289.  Once a month he shopped
for about thirty minutes with his mother.  He reported that he could walk fifty
yards before he needed to stop and rest for ten minutes.  R. 292.  Wagner

---

[2] Norco is a pain reliever consisting of hydrocodone and acetaminophen.  See R. 605.  Dr. Dold
apparently continued Wagner's existing pain medication.

concluded, "I'm in constant pain—2 doctors said I needed surgery, but I cannot afford it.  Doctors have said my condition will only worsen."  R. 294.

On February 25, 2013, Wagner saw state agency physician Dr. Vittal Chapa, M.D., for a consultative examination.  R. 527-33.  Wagner reported pain in both shoulders and in his neck.  He also reported a sciatic nerve problem in his left leg.  Wagner reported his pain as a 10, with 10 as the maximum pain.  Wagner reported that the pain was constant.  Wagner reported that sometimes his right arm swelled, and sometimes his neck froze in one position.  He reported that he saw a neurosurgeon, but could not afford to see him again.  Wagner reported that he had tingling in his fingertips, and he sometimes could not put on his shoes and socks. R. 527.

On examination, Wagner was 5 feet 9½ inches tall and weighed 253 pounds.  Wagner was in no acute distress.  Wagner's gait was normal and he could ambulate without assistive devices.  Wagner's hand grip strength was 5/5 bilaterally.  Wagner had no motor weakness or muscle atrophy. Wagner showed no evidence of joint redness, heat, swelling or thickening. Wagner could perform both fine and gross manipulations with both hands. Wagner had limited range of motion in both the cervical and lumbar regions of his spine.  Dr. Chapa stated that Wagner had full range of motion in all

other joints, although Dr. Chapa did not fully test Wagner's range of motion in his hips and knees due to pain.  R. 531, 533.  Straight leg testing was negative.  Wagner's sensory examination was within normal limits. Dr. Chapa found no evidence of cervical radiculopathy.  Wagner had mild difficulty getting on and off the examination table.  Wagner also had mild difficulty tandem walking, walking on toes, and walking on heels. Wagner was unable to squat and arise from the squatting position.  R. 533.

On February 12, 2013, state agency physician Dr. C.A. Gotway, M.D., prepared a Residual Functional Capacity Assessment.  Dr. Gotway opined that Wagner could occasionally lift twenty pounds and frequently lift ten pounds; could stand and/or walk six hours in an eight-hour day; could sit for six hours in an eight-hour day; and could occasionally climb ramps, stairs, ladders, scaffolding, and ropes; could occasionally stoop, crouch, and crawl.  Dr. Gotway opined that Wagner was limited in reaching overhead.  Dr. Gotway opined that Wagner had no other relevant functional limitations for work activities.  R. 105-06.

On March 18, 2013, Wagner saw Dr. Oligschlaeger with complaints of back and neck pain.  R. 549-50.  Wagner reported that he was hurt on the job and needed surgery but his employer's worker's compensation insurer has not approved it yet.  On examination, Wagner's neck was

supple with full range of motion.  R. 550.  Dr. Oligschlaeger assessed neck and back pain.  Dr. Oligschlaeger prescribed Lyrica and Hydrocodone/ Acetaminophen for the pain.  R. 550, 554.[3]

On April 4, 2013, Wagner saw neurologist Dr. Douglas Dove, M.D. Wagner reported low back pain.  Wagner reported pain and weakness in both legs.  Dr. Dove reviewed Wagner's medical history and test results. On examination, Dr. Dove found Wagner's neck was supple with full range of motion; his pinprick sensation and other sensory reactions were normal; he had normal muscle strength, tone, gait, and stance; he could tandem walk, heel walk, and toe walk; and the rest of his motor examination was normal.  R. 608.  Dr. Dove assessed cervical pain with pain radiating into the left upper limb with a left C6 and C7 radiculopathy, right shoulder disease with rotator cuff tendinopathy, and left hip pain due to gout. R. 604.  Dr. Dove started Wagner on Ketoprophen for pain, in addition to his Norco prescription.  R. 605.

On April 24, 2013, Wagner saw Dr. Oligschlaeger for back and neck pain.  Wagner reported that he was having pain.  Wagner again reported that the worker's compensation insurer had not yet approved surgery.  He

---

[3]The treatment note stated that Dr. Oligschlaeger prescribed Vicodin; however, he issued a prescription dated March 21, 2013, for hydrocodone/acetaminophen.  Vicodin is a combination of hydrocodone and acetaminophen.  Dorland's Illustrated Medical Dictionary (32nd ed. 2012) (Dorland's), at 2055.

was running out of pain medication and had no money to buy more. Wagner gave Dr. Oligschlaeger some papers from Wagner's lawyer for Dr. Oligschlaeger to complete. On examination, Wagner was 5 feet 11¼ inches tall and weighed 258 pounds. His neck was supple with full range of motion. Dr. Oligschlaeger assessed neck and back pain. Dr. Oligschlaeger refilled the pain medication prescription. Dr. Oligschlaeger concluded, "He appears to be stuck in a catch 22 right now as he needs to have further testing to confirm and plan surgery but he has no job or money to pay for it." R. 558.

On April 24, 2013, Dr. Oligschlaeger prepared Residual Functional Capacity Report on Wagner. Dr. Oligschlaeger opined that if Wagner performed work at the sedentary level, he would suffer pain that would cause him to take additional breaks totaling an hour or more per day over and above typically allowed breaks. R. 535. Dr. Oligschlaeger opined that Wagner would be absent more than three times per month due to his impairments or treatment for his impairments. Dr. Oligschlaeger concluded, "He appears to have suffered injury to the neck that has affected his arms. He now is limited due to pain. His evaluation by specialists has been hampered by his lack of insurance & money to pay for the evaluation." R. 537.

On June 18, 2013, state agency physician Dr. Sandra Bilinsky, M.D., prepared a Residual Functional Capacity Assessment of Wagner. Dr. Bilinsky's concurred with Dr. Gotway's February 12, 2013, opinions of Wagner's residual functional capacity.  R. 124-25.

On October 18, 2013, Wagner saw Dr. Julian Vassay, M.D., for a follow up after an emergency room visit.  Wagner had gone to the emergency room on October 15, 2013, for right foot pain diagnosed as gout.  The emergency room physicians prescribed Norco and prednisone. Wagner reported to Dr. Vassay that his pain definitely improved on the prednisone.  Wagner reported that he had a long history of foot pain.  On examination, Wagner had some diffuse tenderness over the right base of the great toe.  Wagner stated that he did not have any warmth, erythema, induration or swelling.  Dr. Vassay continued Wagner's medications and drew blood to test Wagner's uric acid levels.  Dr. Vassay recommended that Wagner cut back on his beer consumption.  R. 563-64.  The blood test showed elevated uric acid levels.  Dr. Vassay prescribed allopurinol to reduce Wagner's uric acid level.  R. 567.

On December 16, 2013, Wagner saw Dr. Vassay.  Wagner reported his gout pain had improved.  He had only one minor gout flare since starting the allopurinol.  Wagner also reported right leg pain unrelated to his

gout.  On examination, Dr. Vassay found no evidence of gout.  Dr. Vassay ordered x-rays of the right leg and referred Wagner to an orthopedic specialist.  R. 567.

On March 7, 2014, Wagner underwent an x-ray of his cervical spine. The x-ray showed mild degenerative disk disease at the C5-C6 and C6-C7 levels, with marked osteophytic impingement upon the left intervertebral foramen at the C5-C6 level; and moderate levoscoliosis of the upper cervical spine, which had increased since Wagner's February 17, 2012, x-ray.  R. 594.

On March 17, 2014, Wagner saw neurologist Dr. Dove for EMG and nerve conduction studies of Wagner's upper limbs.  The EMG examination showed abnormal denervation changes, but the nerve conduction studies showed normal conduction velocities.  Dr. Dove concluded that the studies were consistent with left C6 and left C7 radiculopathy.  Dr. Dove found no evidence of generalized polyneuropathy or a specific distal entrapment syndrome.  R. 595.

On March 19, 2014, Dr. Dove performed EMG and nerve conduction studies of Wagner's lower limbs.  The test results were normal.  Dr. Dove stated that the test results did not support a finding of either lumbar or

sacral radiculopathy, generalized peripheral polyneuropathy, or a specific distal entrapment syndrome.  R. 599.

On March 24, 2014, Wagner underwent an MRI of his cervical spine. The MRI showed neural foraminal encroachment on the left at C5-C6 and C6-C7.  On March 26, 2014, Wagner underwent an MRI of his lumbar spine, which was benign.  R. 604.

On April 21, 2014, Wagner saw Dr. Marshall Brustein, M.D.  Wagner reported neck pain and right shoulder pain.  Wagner reported that the pain moderately limited his activities.  On examination, Dr. Brustein found moderate weakness in the rotator cuff.  The impingement test was positive, and the Yergason's test was positive.[4]  X-rays taken that day did not show any fractures or dislocations.  The x-rays also did not show any osseous abnormalities.  Dr. Brustein diagnosed rotator cuff syndrome.  Dr. Brustein prescribed occupational/physical therapy for six weeks.  R. 569-72.

On May 21, 2014, Wagner saw neurosurgeon Dr. Dold again.  At this time, Wagner complained primarily about pain in his left hip.  Wagner reported that his left hip socket was very painful.  He reported that he could not walk.  He reported that the pain radiated down his left leg.  Wagner reported no pain in his right hip.  Wagner reported that he could not bend

---

[4] Yergason's test is a test designed to diagnose biceps tendon instability or tendonitis.  Woodard, "The Painful Shoulder: part I.  Clinical Evaluation," 61 American Family Physician (May 15, 2000), at 3079-88, available at www.aafp.org/afp/0515/p3079.html, viewed on June 1, 2016.

over and could not trim his toenails due to the pain.  Wagner also reported

severe pain in his neck and tingling in both arms.  R. 583.

On examination, Dr. Dold found that Wagner's neck had decreased

range of motion and diffuse tenderness.  Proximal and distal motor power

was normal, but Wagner had some giveaway weakness proximally and

distally.  Wagner had decreased pinprick sensation in his left hand.

Wagner reported pain on manipulation of both of his hips.  Proximal and

distal motor power was good in the lower extremities.  Wagner had sensory

changes in the left foot.  The range of motion of his lumbar spine was

restricted, and the lumbar spine had several areas of tenderness.

Wagner's gait was antalgic.  Lumbar studies performed in March 2014

showed advanced degeneration at L4-5 and L5-S1 with some disc

pathology at L4-5, but no "overtly worrisome nerve root compression."

Dr. Dold recommended gathering more information about Wagner's hip.

R. 584.

On June 20, 2014, Wagner saw Dr. Dold for a follow-up examination.

Dr. Dold stated that prior radiographic studies showed fairly advanced

multilevel cervical and lumbar spondylosis.  X-rays taken at this visit

showed severe degenerative changes in Wagner's left hip with deformity

and significant lipping.  The x-rays showed some degenerative disease in the right hip, but no fracture or bone destruction.  R. 586, 589, 591.  The x-ray of the pelvis also showed that, "Avascular necrosis involving the left femoral head may be present."  R. 588.  Dr. Dold concluded, in part, "Mr. Wagner's main complaint of pain currently revolves around his left hip.  It would certainly seem that there is good radiographic and clinical correlation for significant hip disease with appears to be disabling."  Dr. Dold recommended referral to an orthopedic specialist.  At Dr. Oligschlaeger's suggestion, Dr. Dold referred Wagner to orthopedic surgeon Dr. Jacob Sams, M.D.  R. 586.

On August 7, 2014, Wagner went to see Dr. Dold.  Wagner reported that he saw Dr. Sams and received an injection in his left hip that gave him "some temporary relief."  Wagner reported that he still had pain in his neck, right arm, back, left leg, and right hip.  Dr. Dold found that the most recent x-rays of Wagner's pelvis and hips showed severe "changes on the left" and "evidence of avascular necrosis per the radiology report."  R. 611.

On examination, Dr. Dold found that Wagner was in "moderate discomfort."  Wagner's pain behavior was "not as prominent as it has been in the past."  Wagner's range of motion in his neck was "moderately restricted with multiple points of tenderness."  Wagner experienced "severe

pain with manipulation of his left hip," and "moderate" pain with manipulation of the right.  The range of motion of his lumbar spine was "moderately restricted."  Dr. Dold stated that Wagner's prior tests showed "an extensive spondylosis."  Dr. Dold added, "I do not see any overtly worrisome compromise of the neural elements.  His EMG and nerve conduction study showed some radiculopathy at C6 and C7."  R. 611.

Dr. Dold noted that he understood that Wagner might be a candidate for hip replacement in the future.  Dr. Dold stated that Wagner was scheduled to see Dr. Sams again and also scheduled to see a rheumatologist.  Dr. Dold planned to see Wagner again after Wagner saw these other specialists.  Dr. Dold concluded, "In the meantime he can continue with his usual activities using common sense precautions."  R. 611.

On August 19, 2014, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  The ALJ conducted the hearing in Peoria, Illinois.  Wagner and his attorney appeared by videoconference from Decatur, Illinois.  Vocational expert James Ragains also appeared in Peoria.  R. 41.[5]  At the beginning of the hearing, the ALJ asked Wagner's attorney, "[I]s the record complete or are there still records outstanding that need to be

---

[5] Ragains's name is incorrectly spelled "Regains" in the transcript of the hearing.  E.g., R. 39, 41.  Ragains's resume and the ALJ's decision both state that his name is spelled "Ragains." R. 12, 194.

submitted before I make my decision?"  The attorney stated that the record was complete.  R. 43.

Wagner then testified at the hearing.  Wagner testified that he was 5 feet 11 inches tall and weighed 245 pounds.  He was divorced.  He had two sons ages 19 and 14 years old.  The sons lived with their mother.  Wagner lived with his parents in a one-story home.  R. 44-46.  Wagner testified that his parents supported him.  Wagner testified that his parents received Social Security retirement benefits and worked pulling trailers across the United States.  R. 50.

Wagner testified that the home had three steps to get to the front door.  Wagner testified that he experienced pain in his neck, back, hips, and lower extremities when he walked up stairs.  R. 46.

Wagner testified that he drove a car about once a week.  He usually drove about eight to ten miles.  Wagner testified that his father drove him the thirty-five miles to the hearing.  Wagner testified that he was unable to drive that distance due to pain.  R. 47.

Wagner testified that he did not smoke, but he used chewing tobacco. He also testified that he drank about three beers a day.  The ALJ noted that Wagner alleged in his 2009 Disability Benefits application that he was an alcoholic.  The ALJ asked whether Wagner was currently drinking the same

amount as he was in 2009.  Wagner testified that in 2009 he drank six to eight beers and whiskey daily.  He testified that he cut back "because of the pain medicine that I'm on."  R. 47.  He testified that he no longer drank hard liquor.  R. 48.  Wagner testified that his mother, his brother, and friends provided him with beer.  He testified that he also bought beer with some of the money that he still had from when he was working.  R. 70.

Wagner testified that he filed a worker's compensation claim for the injuries he suffered on February 4, 2012.  He testified that his claim was denied.  Wagner testified that he had not received any unemployment insurance benefits or other disability benefits since February 2012. R. 51-52.

Wagner testified that he previously worked as a bartender and manager at a steakhouse.  He left that job when the steakhouse closed in 2009.  He then worked as a packager, loading sleeves of paper cups into boxes.  He left that job when he was injured in February 2012.  He testified that he had been unable to work since then because of the pain.  R. 52.

Wagner testified that he spent about half of each day lying down or reclining because of his pain.  He testified that he had pain in his neck, shoulders, throughout his upper extremities down to his fingertips, and his hips.  R. 55.  Wagner testified that if he sat up to drink coffee and read the

newspaper, "my neck is so bothering me I got to get up, I got to go lay down until the pain goes away." R. 55. Wagner testified that he played games on a PlayStation about twenty to thirty minutes at a time, for a total of about an hour a day. R. 73. He testified that he watched television about five to six hours a day. 74. Wagner testified that he played with his PlayStation and watched television while lying down. R. 78-79.

Wagner testified that his mother usually cooked the evening meal. He poured a bowl of cereal if he wanted something during the day. He testified that when his parents were gone, "I just get a bowl of cereal or just something quick and easy to fix in the microwave." R. 56.

Wagner testified that he slept about four to five hours a night. He testified that he typically took one nap a day for up to an hour. Wagner testified that his pain woke him up during the night and during his daytime nap. R. 74.

Wagner testified that he was in severe pain every day. He testified that the pain would become unbearable if he did not lie down or recline much of the day. R. 56. Wagner testified that "[j]ust getting up moving around, being on my feet" triggered his pain. He testified that reading a paper hurt his neck "to where I can't finish the paper." R. 66.

Wagner testified that he did his some laundry, and he washed his cereal bowl.  R. 57.  Wagner testified that his mother did most of the laundry for the household.  Wagner estimated that he did two out of every ten loads of laundry for the household.  R. 58.  Wagner testified that "if I'm not feeling too bad, I might push the vacuum sweeper, but I can't finish a room without taking a break."  R. 57.  Wagner testified that the last time he vacuumed was a couple of weeks before the hearing.  R. 59-60.  Wagner testified that he did not move furniture when he vacuumed.  He usually had to take a ten to fifteen minute break after vacuuming one-quarter of a room.  Wagner testified that he did not vacuum on a day that he did laundry.  R. 60.  Wagner testified that he did not do any yardwork or other work outside the house.  R. 61.

Wagner testified that he went grocery shopping with his mother about once every two weeks.  He then testified that he went about once every three weeks.  R. 61-62.  He testified that on 60 to 70 percent of these shopping trips, he stayed in the car at the grocery store while his mother shopped.  Wagner testified that when he went into the store, he sat on a bench while his mother shopped.  R. 63.

Wagner testified that he did not go out to visit with friends.  He testified that he went to a family reunion about three months before the

hearing.  He testified that he did not attend any group, organization, or church activities.  R. 75.

Wagner testified that he could not touch his left foot, put on a sock, or clip his toenails because of his hip pain.  R. 64.  Wagner testified that movement and walking triggered his hip pain.  R. 66.

Wagner testified that he also had difficulty dressing himself.  R. 64. He needed help putting on his left sock.  He also needed help putting on a pullover sweater.  R. 66.  He testified that he also had difficulty bathing and showering because of the pain.  R. 65.  He testified that he could wash himself and take care of his personal hygiene, but the process took longer because of the pain.  R. 66.

Wagner testified that he could walk about three yards before he needed to stop.  He testified that he used a walker when he had gout.  He testified that he could stand for "[n]o more than an hour."  R. 67.  He testified that he needed to lie down after standing to relieve the pain in his neck and his hip.  He testified that he could sit for thirty to forty-five minutes at a time.  He testified that he needed to lie down after sitting due to the pain.  R. 68.

Wagner testified that he could lift ten to twenty pounds.  He testified that he had "a hard time lifting a gallon of milk."  R. 76.  Wagner testified

that he used the term "hard time" to mean that his arm would go numb. He testified that he could lift a two-pound plate without having a "hard time." R. 79.  Wagner testified that using his left arm caused pain in his neck. R. 80.

Wagner testified that grabbing something or raising his right arm caused pain in his right shoulder.  R. 68-69.  Wagner testified that he had numbness and tingling in his right hand.  He testified that the numbness and tingling increased with movement, such as turning a door knob or pulling up a zipper.  R. 77.

Wagner testified that he could not write a letter for a job application without having to take a break.  He testified that he could not write while sitting at a table for more than fifteen minutes.  He testified that after fifteen minutes he would need to lie down for an hour before he could continue. R. 80-81.

Wagner testified that his gout flared up about four to five times a year. He testified that these episodes of gout lasted for a week to a week and a half.  Wagner testified that his diet did not affect his gout symptoms.  He testified that his doctors recommended that he stop drinking to help reduce flare ups of gout pain.  R. 70.

Wagner testified that his doctors told him he needed surgery on his neck and hips.  R. 64.  Wagner testified that he would undergo the recommended surgeries if he had the resources to pay for them.  R. 65. He testified that his goal would be, "Getting it fixed," and to "Get better."  R. 65.

Wagner testified that he was not receiving any mental health treatment.  Wagner testified, however, that he was "depressed all the time." He testified that he could not afford mental health treatment.  He did not try to get mental health services from low income clinics.  R. 71-72.

Vocational expert Ragains also testified at the hearing.  Through a series of hypothetical questions, the ALJ asked Ragains whether a person with Wagner's age, education, and work experience could perform any of Wagner's prior relevant work if the person is limited to sedentary work in which the person:  can lift no more than ten pounds; can stand or walk no more than a total of two hours in an eight-hour workday; must be allowed to alternate between sitting and standing every thirty minutes for five minutes; must not climb ladders, ropes or scaffolds; may only occasionally climb ramps and stairs, kneel, crouch, and crawl; may only occasionally reach overhead bilaterally; may not constantly handle or finger bilaterally, but may frequently handle and finger bilaterally; and must avoid concentrated exposure to hazardous machinery and unprotected heights.  R. 86, 88-89.

Ragains opined that such a person could not perform Wagner's prior work as a hand packager and bartender/restaurant manager, as he performed those jobs.  Ragains opined that such a person could perform representative jobs of a food and beverage order clerk, with 900 such jobs in Illinois and 19,400 nationally; and a sedentary final assembler, with 1,700 such jobs in Illinois and 28,500 nationally.  R. 87-89.

Wagner's counsel stated to the ALJ during his examination of Ragains that, "I don't have a problem with [Ragains'] qualifications," but noted that the record did not contain a statement of Ragains' qualifications. R. 93.  Wagner's counsel asked that such a statement be included in the record.  The ALJ agreed.  R. 93-94.  Ragains' resume listing his qualifications was added to the record.  R. 194-96.  The hearing concluded at the end of Ragains' testimony.

<u>THE DECISION OF THE ALJ</u>

On September 2, 2014, the ALJ issued her decision. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If

true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th

Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Wagner met his burden at Steps 1 and 2. Wagner had not engaged in substantial gainful activity since February 12, 2012, and Wagner suffered from the severe impairments of degenerative disc disease of the cervical spine and radiculopathy in the upper extremities, degenerative disease of the hips bilateral, right shoulder tendinopathy, remote history of lumbar spine surgery, gout, and obesity. R. 14.

The ALJ found at Step 3 that Wagner's impairments or combination of impairments did not meet or equal a Listing. The ALJ considered the Listings for dysfunction of major joint, disorders of the spine, and inflammatory arthritis. R. 17.

The ALJ also addressed the impact of Wagner's obesity. The ALJ stated that she considered the Social Security Administration guidelines regarding the effect of obesity. The ALJ quoted a portion of those guidelines which stated that obesity "may or may not increase the severity or functional limitations of other impairments." R. 17 (quoting SSR 02-1.). The ALJ stated that she "has fully considered obesity in the context of the overall record evidence in making this decision." R. 17.

At Step 4, the ALJ determined that Wagner had the following RFC:

[T]he claimant has the residual functional capacity to perform sedentary work . . . except limited to lifting no more than 10 pounds; standing or walking no more than 2 hours in an 8-hour work day; must be allowed to alternate between sitting and standing every 30 minutes for 5 minutes; no climbing ladders, ropes or scaffolds; occasional climbing ramps and stairs, kneeling, crouching, and crawling; no more than occasional overhead reaching bilaterally; no constant handling or fingering bilaterally; and must avoid concentrated exposure to hazardous machinery and unprotected heights.

R. 18.  The ALJ relied on the various medical records that described Wagner's medical impairments as moderate to mild, Dr. Chapa's consultative examination, and the opinions of agency physicians Drs. Gotway and Bilinsky.  R. 19-22.  The ALJ also relied on Wagner's testimony that he could lift ten pounds and sit for thirty to forty-five minutes at a time before he needed to move around, and relied on the 2010 Physical Impairments Questionnaire in which Wagner stated that he could sit for two hours at a time.  R. 18.  The ALJ found:

In terms of the claimant's alleged degenerative disc disease of the cervical spine and radiculopathy in the upper extremities, degeneration of the hips bilaterally, right shoulder tendonopathy, remote history of lumbar spine surgery, and obesity, the longitudinal medical evidence of record does not show these impairments prevent the claimant from engaging in all substantial gainful activity. The diagnostic, objective and clinical findings are not shown to be reasonably correlated to pain symptoms or functional limitations that have occurred with such frequency or severity throughout the period under consideration so as to render the claimant disabled.

R. 19.

The ALJ found that Wagner's statements were not fully credible regarding the severity of his functional limitations due to his pain.  The ALJ found that Wagner's statements about the severity of his pain were "so extreme, at times, as to appear implausible, which calls into question the credibility of the claimant's alleged chronic, disabling pain symptoms." R. 19.  The ALJ noted that Wagner regularly rated his pain at a 10 out of 10, but found this representation to be inconsistent with numerous medical reports which found moderate to mild findings on imaging reports and physical examinations that found normal strength and moderate to no limitation in his range of motion of his joints and spine.

The ALJ gave no weight to the opinions of Dr. Oligschlaeger.  The Court first addressed the April 4, 2012 unsigned note from the offices of Dr. Oligschlaeger and Physician's Assistant Hayden that Wagner was unable to work at this time.  The ALJ found that the statement was conclusory.  The ALJ found it significant that Dr. Oligschlaeger did not use the term "disabled."  The ALJ found that the statement that Wagner was unable to work meant he could not return to his past work, not that Wagner was disabled.  The ALJ also found that an opinion that Wagner was disabled was inconsistent with the other evidence in the record.

The ALJ also gave no weight to Dr. Oligschlaeger's April 24, 2013, Residual Functional Capacity Report. The ALJ stated that he gave no weight to this opinion for the same reason that he gave no weight to the April 4, 2012, "unable to work" comment. The ALJ found that the assessment was outside Dr. Oligschlaeger's area of expertise. The ALJ found that Dr. Oligschlaeger appeared to be acting out of sympathy toward Wagner. The ALJ also found that Dr. Oligschlaeger's opinions were not supported by other evidence in the record. As an example, the ALJ noted that Dr. Oligschlaeger stated that Wagner had decreased grip strength, but Dr. Oligschlaeger's treatment notes did not mention decreased grip strength and Dr. Chapa's consultative examination found normal grip strength. R. 23.

The ALJ also discounted Dr. Dold's reference to avascular necrosis in Wagner's hip. The ALJ found that the radiology report did not support a finding of avascular necrosis. R. 23.

The ALJ concluded at Step 4 that Wagner could not return to his prior work. At Step 5, the ALJ found that Wagner could perform a significant number of jobs that existed in the national economy. The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the testimony of vocational expert Ragains. Based on Ragains'

testimony, the ALJ found that Wagner could perform the representative jobs of food/beverage clerk, and assembly/final.  The ALJ concluded that Wagner was not disabled.

Wagner appealed to the Social Security Administration Appeals Council.  On November 5, 2014, Wagner sent additional medical records to the Appeals Council.  R. 613-57.  The records included the records from Wagner's July 1, 2014, appointment with Dr. Sams.  Dr. Sams stated that the x-rays of Wagner's hips showed severe joint space narrowing of the femoroacetabular joint with osteophyte formation and subchondral sclerotic changes.  R. 613.  The range of motion in Wagner's hip was limited and painful.  Dr. Sams gave Wagner a steroid injection in his left hip.  R. 614.

On February 26, 2015, the Appeals Council denied Wagner's request for review.  As a result, the decision of the ALJ became the final decision of the Defendant Commissioner.  R. 1.  Wagner has now filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

Page **32** of **39**

This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

In this case, the ALJ misread some of the 2014 medical evidence related to Wagner's hip and failed to minimally articulate her analysis of Dr. Dold's August 21, 2014 examination findings.  Dr. Dold's report is at pages 610-613 of the record.  The ALJ misread, or did not read, the 2014 radiologist report on x-rays of Wagner's hip.  The ALJ stated that the report did not mention the possibility of avascular necrosis.  R. 23.  The radiologist, however, mentioned that avascular necrosis cannot be entirely excluded and should be considered in his July 20, 2014 imaging report.  R. 588.  Due to this error, the ALJ erroneously stated that Dr. Dold's August 21, 2014, reference to a radiology report that showed evidence of

avascular necrosis was not supported by evidence in the record.  R. 23.  In so doing, the ALJ erred in her analysis of Dr. Dold's examination findings.

In addition, the ALJ failed to address Dr. Dold's June 20, 2014, opinion that Wagner had "significant hip disease which appears to be disabling."  R. 588.  Dr. Dold did not render this opinion in a one-time consultation.  Dr. Dold saw Wagner three times for his hip pain.  Dr. Dold reviewed past x-rays of Wagner's spine and ordered x-rays of Wagner's hip.  In light of the extensive nature of Dr. Dold's examination and his expertise as a neurosurgeon, the ALJ erred in not addressing Dr. Dold's opinion.

The Commissioner argues that the ALJ adequately articulated her analysis of Dr. Dold's findings regarding Wagner's hip.  The Commissioner argues that the ALJ did not need to address Dr. Dold's opinion directly because she adequately evaluated Dr. Dold's examination note regarding Wagner's hip.  The Commissioner also argues that the ALJ's erroneous statement about radiology reports failing to mention avascular necrosis was harmless.  The Court disagrees.  Dr. Dold's examination notes and Wagner's hip x-rays formed a material part of the evidence in the record regarding Wagner's hip.  The ALJ  (1) misread the radiology report,

(2) erroneously discounted Dr. Dold's statements regarding avascular

necrosis as a result of the misreading of the report, and (3) failed to

address Dr. Dold's opinion that the hip condition appeared to be disabling.

The combination of these errors is not harmless.  The ALJ failed to

minimally articulate her analysis of relevant material evidence regarding

Wagner's hip.  The case therefore must be remanded.

Wagner fails to demonstrate any of his other claims of error.  The

ALJ's RFC finding was supported by the opinions of Drs. Gotway (R. 105-

106) and Bilinsky (R. 124-125).  The ALJ's typographical error in her

citations to the record are not grounds for reversal.[6]  Wagner's assignment

of error based on this typographical error borders on the frivolous.

The ALJ also adequately discussed the other opinion evidence in the

record.  The failure to mention details of Dr. DeGrange's opinion was not

material because Dr. DeGrange concluded that Wagner could perform

light duty work.  The ALJ's findings, therefore, were consistent with

Dr. DeGrange's opinion of Wagner's functional limitations.  The ALJ

adequately considered the note from Dr. Oligschlaeger's office that Wagner

could not return to work.  The ALJ reasonably concluded the note referred

to returning to his packing job, not returning to any work generally.

---

[6] The ALJ confused Exhibits 3F, 5F, and 7F with Exhibits 3A, 5A, and 7A, as pointed out on page three of
the Commissioner's Memorandum in Support of Motion for Summary Affirmance (d/e 22, p.3).

The ALJ's decision to give no weight to Dr. Oligschlaeger's April 24, 2013, opinion is also supported by substantial evidence.  A treating physician's opinions are entitled to controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other evidence in the record. 20 C.F.R. § 404.1527(d)(2); <u>see</u> <u>Bauer v. Astrue</u>, 532 F.3d 606, 608 (7th Cir. 2008).  Dr. Oligschlaeger's opinions were inconsistent with other objective medical findings that showed Wagner had mild to moderate impairments and limitations in his spine and shoulders.  The inconsistencies in the evidence supported the ALJ's decision to give no weight to Dr. Oligschlaeger's opinions.

The ALJ did not cherry pick the record.  The ALJ thoroughly reviewed the record.  The ALJ erred with respect to the evidence regarding Wagner's hip as discussed above, but she did not cherry pick the record.  Wagner essentially wants the Court to reweigh the medical evidence.  This the Court will not do.  <u>See</u> <u>Young v. Barnhart</u>, 362 F.3d 995, 1001 (7th Cir. 2004).

The Vocational Expert Ragains' testimony was consistent with the Department of Labor's <u>Dictionary of Occupational Titles</u>.  <u>See</u> <u>SSR 00-4p</u>. Ragains opined on the number of available jobs in Illinois and the nation, a

topic not covered by the DOT.  Ragains' opinions on topics not addressed
by the DOT are not inconsistent with the DOT.

Wagner also cites several decisions in rebuttal that question the
validity of vocational expert opinions on numbers of available jobs.  See
Alauro v. Colvin, 797 F.3d 503, 507 (7th Cir. 2015); Herrmann v. Colvin, 772
F.3d 1110, 1112-14 (7th Cir. 2014); Browning v. Colvin, 766 F.3d 702, 709
(7th Cir. 2014).  In this case, however, Wagner's counsel did not challenge
the qualifications of vocational expert Ragains or challenge the validity of
his opinions regarding the number of available jobs in Illinois or the national
economy.  R. 93.  Therefore, Ragains' opinions were unchallenged expert
opinions from an acknowledged expert, and so, provided substantial
evidence to support the ALJ's finding regarding the number of the particular
jobs cited by Ragains in Illinois and nationally.

The ALJ also adequately considered Wagner's obesity.  She stated
that she included considerations of Wagner's obesity throughout her
decision.  R. 19.  Absent some more specific reference to evidence in the
record about the impact of Wagner's obesity, the Court sees no error.  See
Hisle v. Astrue, 258 F.App'x, 33, 37 (7th Cir. 2007) ("[T]he claimant must
articulate how her obesity limits her functioning and exacerbates her
impairments.").

Lastly, the ALJ's credibility determination is supported by substantial evidence.  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ found inconsistencies in Wagner's claims of debilitating pain and indicated some exaggeration of the effects of his pain.  The Court agrees.  Wagner reported that his pain was 10 out of 10.  See R. 481, 527.  He testified that his pain was almost totally debilitating.  See generally, R. 46-89. On April 21, 2014, however, Wagner reported to Dr. Brustein that his complaints moderately limited his activities.  R. 659.  Several other medical examinations found either no or only moderate limitations on range of motion and strength.  The ALJ could reasonably conclude that Wagner's testimony was inconsistent with his report to Dr. Brustein and the examinations that found normal strength and range of motion.  Wagner also reported in his December 2012 Adult Function Report that he could walk fifty yards before he needed to stop and rest.  R. 292.  Wagner testified at the hearing that he could only walk "three yards, maybe not even that" before he had to stop and sit down.  R.67. Wagner's inconsistent testimony supports the ALJ's conclusion that Wagner exaggerated the

severity of his limitations due to pain.  The Court will not disturb the credibility finding.

The Court does not reach the claims that the Appeals Council erred because the ALJ can consider the additional evidence on remand.

THEREFORE, Plaintiff's Motion for Summary Judgment (d/e 18) is ALLOWED, and Defendant's Motion for Summary Affirmance (d/e 21) is DENIED.  This matter is REVERSED AND REMANDED pursuant to sentence four of 42 U.S.C. § 405(g).  THIS CASE IS CLOSED.

ENTER:   June 24, 2016


_____ s/ Tom Schanzle-Haskins _____
UNITED STATES MAGISTRATE JUDGE